Filed 9/19/25  P. v. Dixon CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MYESHA DIXON,<br><br>Defendant and Appellant. | C101982<br><br>(Super. Ct. No. 2022CR0088792) |

A jury convicted defendant Myesha Dixon of one count of conspiracy to send a controlled substance into prison (Pen. Code, §§ 182, subd. (a)(1), 4573)[1] and two counts of assisting others with sending a controlled substance into prison (§ 4573, subd. (a)).  On appeal, Dixon argues that the evidence was insufficient to support her convictions.  We will affirm.

---

[1]  Undesignated statutory references are to the Penal Code.

1

BACKGROUND

Marcel Dixon[2] and Paul Saechao were both inmates at High Desert State Prison in late 2021. Marcel was married to Dixon and Paul was married to Melissa Saechao.[3] Correctional Sergeant Anastasia Albrecht had been investigating Paul's "criminal dealings" for several years. As part of that investigation, Sergeant Albrecht listened to numerous phone calls between Paul and Melissa. Although many of the calls were "very generic" or difficult to decipher, Sergeant Albrecht learned that Paul had other inmates contact Melissa for "more detailed messages."

On the evening of October 20, 2021, Marcel called Dixon three times. The first phone call occurred at 8:27 p.m. During this call, Marcel gave Dixon Melissa's cell phone number. Marcel then began to read Dixon a handwritten message to be sent to Melissa, but he could not read the entire message; he told Dixon that he would call her back.

Marcel called Dixon again at 8:39 p.m. asking if she was ready to "finish that text." After confirming that she was ready, Marcel told Dixon, "Her husband said go ahead and grab a zip and a half" and "do a 90 page out of those 90 pages." "A zip is common street terminology" for an ounce, or 28 grams, of drugs. A "zip and a half" is an ounce and a half, or 42 grams, of drugs.

Marcel further instructed Dixon that out of the 90 pages, 60 should be sent to inmate "Gauardo" with number "AY7170" in a packet that included stamps and envelopes. Text messages extracted from Melissa's cell phone showed that Dixon texted Melissa at 8:44 p.m.: "Your husband said go grab a zip and a half and 90 pages out of

---

[2] Dixon informs us that her husband's correct name is Marquel. To conform with the record on appeal, the court will refer to Dixon's husband as Marcel. Additionally, to avoid confusion with Dixon, we will refer to Marcel by his first name.

[3] We will also refer to Paul and Melissa by their first names to avoid confusion.

those 60.  Guardo ay7170.  When you send the 60 pages write it and send stamps and envelopes."

Marcel called Dixon a third time at 8:51 p.m.  During this phone call, Dixon informed Marcel that she received a text back from Melissa asking, "So 90 and then only send 60?"  Marcel confirmed to Dixon, "[O]nly 60 to that name."  At 8:53 p.m., Dixon sent another text to Melissa stating, "Only 60 to that name with stamps and envelopes."

Marcel called Dixon twice on November 1, 2021.  During the first call at 8:10 p.m., Marcel asked Dixon to confirm with Melissa whether she mailed the "writing package" to Angel Gallardo, California Department of Corrections (CDC) number AY7170.  Marcel also asked Dixon to text Melissa instructions to mail out 20 pages to "Nerique [*sic*] . . . Esquivel" with CDC number "BE3409" at High Desert State Prison.  Dixon sent Melissa a text at 8:15 p.m. saying, "Your husband wants to know if you mailed out the writing package to the name angle [*sic*] gallardo cdc ay7170.  Or when are you going to mail it out?  And if you can let me know when you do it.  Also if you can mail out 20 pages to this info as well enrique esquibel [*sic*] cdc be3409 to the prison address."

At 8:19 p.m., Melissa responded to Dixon, "The same way tell him I was waiting but ask him the same way?"  Dixon told Marcel about this text during their phone conversation and Marcel instructed Dixon to respond, "Yes."  Dixon texted, "Yes" to Melissa at 8:20 p.m.  Melissa replied, "Ok" twice at 8:23 p.m.

Marcel called Dixon again at 8:51 p.m., asking if "that other number" texted back.  Dixon confirmed that Melissa had responded, "Ok."

Video footage from the post office in Susanville showed Melissa paying to mail two manila envelopes on November 5, 2021.

Sergeant Albrecht intercepted mail for inmates Angel Gallardo, CDC number AY7170 and Enrique Esquivel, CDC number BE3409, on November 8, 2021, in the High Desert State Prison mail room.  The envelopes looked similar to the envelopes Melissa

3

mailed out from the post office on November 5, 2021, and both had been mailed out on November 5, 2021.

The envelope addressed to Gallardo contained 60 sheets of lined paper with a "madisonpaper.com" watermark. The paper looked suspicious to Sergeant Albrecht because it was slightly discolored and had a grainy texture. Based on her training and experience, Sergeant Albrecht suspected that the paper had been soaked in methamphetamine, so she took a sample and tested it using a narcotic analysis reagent kit. The kit returned a presumptive positive for methamphetamine. A criminalist also tested samples from the sheets of paper and determined that they tested positive for methamphetamine.

The envelope addressed to Esquivel contained 24 sheets of lined paper that were also discolored and grainy, bearing the same watermark. A sample taken from the paper in Esquivel's envelope also tested positive for methamphetamine. The amount of methamphetamine in each envelope was a usable quantity.

A jury convicted Dixon of one count of conspiracy to commit the crime of sending a controlled substance into prison (§§ 182, subd. (a)(1), 4573) and two counts of assisting others with sending a controlled substance into prison (§ 4573, subd. (a)). The trial court suspended imposition of sentence and placed Dixon on two years of formal probation on the condition that she spend 364 days in county jail with three days of credit for time served.

Dixon filed a notice of appeal in October 2024. We deemed Dixon's appeal timely under the constructive filing doctrine. (*In re Benoit* (1973) 10 Cal.3d 72.) Her opening brief was filed in March 2025, and this case became fully briefed on June 9, 2025.

4

## DISCUSSION

Dixon contends there was insufficient evidence to support her convictions for conspiracy to send a controlled substance into prison and assisting others with sending a controlled substance into prison. Although Dixon does not deny that she communicated the information from the phone calls with Marcel to Melissa, she claims that the record indicates that she was merely a "dutiful[]" wife who was clueless about "the import of those messages." Dixon therefore concludes there was not sufficient evidence that she knowingly or intentionally conspired to send or assisted in sending drugs into High Desert State Prison. We disagree.

As an initial matter, we decline Dixon's invitation to apply a de novo standard of review to a sufficiency claim, as the applicable standard is well settled. " 'When reviewing a challenge to the sufficiency of the evidence, we ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for " 'substantial evidence—that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt.' [Citation.] In doing so, we 'view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence.' [Citation.] 'We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' [Citation.] We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

5

It is a felony for an individual to knowingly assist in sending any controlled substance into a state prison. (§ 4573, subd. (a).) "[T]he term 'knowingly' involves '*only* a knowledge that the facts exist which bring the act or omission within the [relevant code] provisions.' " (*People v. Low* (2010) 49 Cal.4th 372, 385.) "It 'does not require any knowledge of the unlawfulness of such act or omission.' " (*Ibid.*) "This definition— which is consistent with the notion of general criminal intent—requires the accused to knowingly perform the proscribed act, but does not involve any intent to commit a further act or achieve a particular effect." (*Ibid.*) "Knowingly" requires the individual to have an awareness of the narcotic character of the substance and that it will be sent into a prison. (§ 4573, subd. (a); see *Low*, at p. 386 [knowing possession of a controlled substance requires "awareness of both its physical presence and narcotic character"].)

Additionally, "[a] conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy. [Citations.] [¶] Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416, fn. omitted.) However, the "[c]ommission of the target offense in furtherance of the conspiracy satisfies the overt act requirement." (*People v. Jurado* (2006) 38 Cal.4th 72, 121.)

" 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime." ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1111, italics omitted.) " ' "The existence of a conspiracy may be inferred from the conduct, *relationship*, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 870-871.)

Applying these principles here, we find the evidence sufficiently supports the jury's findings that Dixon both conspired to commit the crime of sending a controlled substance into prison and that she assisted in sending the controlled substance into prison. Marcel instructed Dixon to text Melissa to get a "zip and a half," or 42 grams of drugs, onto 90 pages and to send those pages to inmates Gallardo and Esquivel. Within minutes of Marcel's requests, Dixon accurately relayed the orders to Melissa. Dixon also communicated Melissa's questions and responses back to Marcel. Shortly after these communications, and consistent with the orders made from Marcel to Melissa via Dixon, Sergeant Albrecht intercepted mail to inmate Gallardo containing 60 sheets soaked with methamphetamine and 24 sheets to inmate Esquivel.

At no point during the conversations with Marcel or Melissa did Dixon question the orders, seek clarification of the nuanced terminology, or seem confused about the instructions or responses. She did not ask why Marcel gave her Melissa's phone number and read her a handwritten message to relay to Melissa. She did not ask what a "zip and a half" was or why it was being put on paper that was being mailed to other inmates at the prison. She did not question why Paul relayed directions to his wife through Marcel and Dixon, why Melissa asked Dixon for clarification of the directions rather than asking her own husband, or why Paul sought confirmation that his wife followed the directions from Dixon. Instead, Dixon meticulously passed the pertinent communications between Marcel and Melissa.

Based on this evidence, a fact finder could reasonably infer that Dixon knew that Marcel was ordering drugs to be placed onto sheets of paper and likewise knew those sheets of paper would be sent into prison in writing packages. It is also reasonable to infer that Dixon specifically intended to assist Marcel and Melissa in the scheme to send methamphetamine-soaked sheets of paper into High Desert State Prison through writing packages. Indeed, Dixon acted as a conduit between Marcel placing the orders in prison and Melissa fulfilling the orders. Based on Dixon's conduct acting as the conduit

7

between Marcel, Paul, and Melissa; the relationships between the parties; and the activities of Marcel and Melissa, a fact finder could reasonably infer that "the parties positively or tacitly came to a mutual understanding to commit" (*Thompson*, *supra*, 1 Cal.5th at p. 1111) the crime of sending drugs into prison. Consequently, a fact finder could reasonably infer that Dixon conspired to commit the crimes.

We are not persuaded by Dixon's argument that she was a naïve participant who unwittingly communicated several drug orders from Marcel to Melissa. According to Dixon, there was no direct evidence that she knew or understood what her husband was requesting because "[n]o words were spoken during these communications that [Dixon] would have been expected to believe referred to contraband . . . ." She also denies that she would have conspired to or knowingly assisted in sending drugs into the prison because she knew that her phone calls were being recorded and she harbored a "general disapproval of drug use." These points fail for two reasons.

First, a lack of direct evidence to prove the convictions is not dispositive. Indeed, " '[i]t is seldom possible for the prosecution to offer direct evidence of an agreement to commit a crime. The agreement to commit the crime is usually made in secrecy. The conspiracy must be inferred by the trier of fact from all the circumstances that are proven, and if the inference is a reasonable one it will not be disturbed on appeal.' " (*People v. Chavez* (1962) 208 Cal.App.2d 248, 253.) As previously addressed, the evidence in this case supports the inference that Dixon knowingly assisted others in sending a controlled substance into prison by communicating the orders, responses, and questions between Marcel and Melissa, and that she conspired to do so. There are no grounds to disturb these reasonable inferences on appeal.

Second, Dixon essentially asks this court to reevaluate the evidence in a light most favorable to her and to draw contrary inferences from the evidence.  Given the deferential standard of review, we cannot do so.  (*People v. Myles* (2023) 89 Cal.App.5th 711, 740 ["for purposes of substantial evidence review, we are not permitted to draw inferences contrary to the verdict"].)

DISPOSITION

The judgment is affirmed.


                     /s/
                    BOULWARE EURIE, J.


We concur:


    /s/
MAURO, Acting P. J.


    /s/
FEINBERG, J.